# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>BRIAN GLENN COX,<br><br>Appellant. | No. 45971-0-II<br><br><br>ORDER AMENDING OPINION |

Respondent has filed a motion asking the court to amend its unpublished opinion filed on November 8, 2016. Having considered the motion and supporting materials, the court now orders as follows:

(1) The first paragraph on page 25 is amended to read as follows:

Because Cox was not entitled to an entrapment instruction, as discussed above, his counsel did not perform deficiently when he did not request an instruction. Accordingly, both Cox's ineffective assistance of counsel claim and his related entrapment claim are meritless.

**IT IS SO ORDERED.**

DATED this 22 day of November, 2016.

JOHANSON, J.

We concur:

WORSWICK, P.J.

MELNICK, J.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  45971-0-II |
| Respondent, | |
| v. | |
| BRIAN GLENN COX, | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, J. — On remand from the Supreme Court,[1] Brian Glenn Cox appeals his jury trial convictions for two counts of criminal solicitation of first degree murder and one count of a gross misdemeanor violation of a protection order (DV-VPO) and his resulting sentence.  He argues that (1) the trial court violated his public trial right, (2) the jury was not unanimous in its DV-VPO conviction, (3) the prosecutor committed misconduct regarding one count of solicitation, (4) his counsel was ineffective when he failed to object to the misconduct, (5) the sentencing court miscalculated his offender score for the other count of solicitation, and (6) his counsel was

---

[1] On direct appeal, we reversed Cox's convictions and held that the trial court denied Cox his right to a public trial when the trial court excused jurors for cause amidst jury selection during a sidebar conference effecting an improper trial closure.  *State v. Cox*, noted at 187 Wn. App. 1038, *remanded*, 184 Wn.2d 1009 (2015).  After remand from the Supreme Court, we requested supplemental briefing on the public trial issue.

ineffective when he failed to object to the offender score miscalculation. Cox (7) raises multiple additional arguments in his statement of additional grounds (SAG).[2]

We hold (1) in light of our Supreme Court's decision in *State v. Love*,[3] the sidebar conference did not constitute a courtroom closure and the trial court did not violate Cox's right to a public trial. We further hold that (2) express unanimity is not required because there was sufficient evidence of both alternative means of violating the protection order, (3) Cox waived his prosecutorial misconduct argument, (4) defense counsel did not provide ineffective assistance when he did not object to the State's closing argument, (5) the sentencing court properly calculated Cox's offender score, (6) defense counsel did not provide ineffective assistance when he did not object to the calculation of Cox's offender score, and (7) Cox's SAG arguments either fail or cannot be addressed. We affirm his convictions and sentences.

FACTS

I. BACKGROUND FACTS

In 2013, Cox and his estranged wife, Lisa Cox, were embroiled in a contentious divorce. In March 2013, Lisa[4] obtained a protection order against Cox. One provision of the protection order restrained Cox from harassing Lisa. A second provision restrained Cox from contacting or coming near Lisa. Another provision prohibited Cox from knowingly coming within 500 feet of

---

[2] RAP 10.10.

[3] 183 Wn.2d 598, 354 P.3d 841 (2015), *cert. denied*, 136 S. Ct. 1524 (2016).

[4] For clarity, we refer to Lisa Cox by her first name.

Lisa's residence, although Cox was allowed to use the road near Lisa's residence, Capitol Boulevard, to commute to his workplace.

A few days after Lisa obtained the protection order, she reported to the police that Cox had violated the order. She told the police that Cox had tailgated her on Capitol Boulevard, honking and "[e]xtending his middle finger" toward her. 1 Report of Proceedings (RP) at 153. Cox later testified that he was commuting home from work.

In April 2013, Cox told his coworker, Ray Lopez-Ortiz, about the divorce and offered him half of the life insurance policy on Lisa to make Lisa "permanently disappear." 2 RP at 281. With the police recording, Lopez-Ortiz called Cox to confirm that Cox was serious about having his wife killed, and Cox and Lopez-Ortiz arranged a meeting.

The day of the meeting, the police hid audio and video recorders on Lopez-Ortiz and listened as Cox told Lopez-Ortiz that Cox was "totally serious" and that "I still want that b**** dead, and [i]t's still worth 10 Grand to me." Ex. 8 at 1-2. The police arrested Cox within an hour for soliciting Lisa's murder. The police interviewed Cox that day. Because of a technical issue, about 40 minutes of the interview were not recorded.

For about a month of his pretrial incarceration, Cox was cellmates with Kenneth Parmley. According to Parmley, Cox said that he had been set up by Lopez-Ortiz; Cox asked Parmley if Parmley or someone Parmley knew could "get rid of" Lopez-Ortiz. 3 RP at 482. Hoping to make a deal with the State, Parmley instead reported the conversations.

The State charged Cox with three counts: count I, criminal solicitation of Lisa's murder; count II, criminal solicitation of Lopez-Ortiz's murder; and count III, gross misdemeanor DV-VPO.

4

## II. JURY TRIAL

### A. JURY SELECTION

Cox's trial took place in February 2014. During jury selection, the trial court held a sidebar conference in open court, after which the trial court excused three jurors for cause on the record:

> THE COURT: . . . I'd like to make a record of sidebar we had before we selected the jury. At that time, there were requests to excuse for cause No. 6, 40 and 43. The state did not object to 6 or 40. The state did object to 43. They indicated in my thinking we were not going to reach 43 anyway and we did not, but I granted the challenges for cause for each of those three, 6, 40 and 43.
> Does anybody need to put anything else on the record in that regard?
> [STATE]: Your Honor, just to be specific, I think with 6 and 40, it was actually the state that made the request, made the motion, but I think they might have been agreed or stipulated by defense, but I think just for technicality purposes that was --
> THE COURT: That's right. It was you that made the objection.
> [COX]: And I agree, it was the state that made the strike for cause and I did not object to either one.
> . . . .
> [THE COURT:] Is there anything else I need to memorialize about any sidebars or actions outside the record?

1 RP at 126-27. Both counsel were satisfied with the record.

### B. DV-VPO (COUNT III)

At trial, Lisa testified that in March 2013, a few days after she obtained the protection order against Cox, she noticed Cox driving behind her on Capitol Boulevard and honking his horn. Cox accelerated, driving so closely behind her that she could not brake without risking a collision with Cox's vehicle. Cox tailgated Lisa for about a block, "[e]xtending his middle finger" toward her and "mouthing things." 1 RP at 153-54.

Cox testified that Lisa, not Cox, had initiated the encounter. He claimed that he was returning from his workplace that day when he noticed Lisa driving in front of him. Lisa "brake checked [him]," nearly causing Cox to collide with her car, and "flipped [him] off." 4 RP at 674.

5

In response, Cox "laid on the horn," returned the gesture, and mouthed words to Lisa.  4 RP at 674.

### C.  SOLICITATION TO MURDER LISA (COUNT I)

The State presented Lopez-Ortiz's testimony and recordings of his phone call and meeting with Cox in which Cox solicited Lopez-Ortiz to murder Lisa.  Lopez-Ortiz testified that he had ridden the elevator with Cox at work one day and that Cox offered Lopez-Ortiz half the life insurance policy on Lisa's life if he made her "permanently disappear."  2 RP at 290.

During the recorded conversation, Lopez-Ortiz telephoned Cox and arranged to meet him in person.  Cox told Lopez-Ortiz that "[t]his makes me very happy" and that Cox was "willing to go into debt for [Lopez-Ortiz] if [he] did this for [Cox]."  Ex. 7 at 3.  After the call ended, Lopez-Ortiz can be heard on the recording commenting to the police that Cox was "not joking."  Ex. 7 at 4.

On the day of the meeting, Cox took Lopez-Ortiz, on whom audio and video recorders were hidden, to a secluded area at work.  Lopez-Ortiz asked Cox if he was serious or if it was "a bad joke."  Ex. 8 at 1.  Cox said that he was "totally serious" but that Cox was no longer the beneficiary of Lisa's life insurance policy.  Ex. 8 at 1.  Regardless, Cox said, "I still want that b**** dead, and [i]t's still worth 10 Grand to me."  Ex. 8 at 2.  Smiling, he told Lopez-Ortiz that "we're talking murder here, man."  Ex. 8 at 4.  Cox said that in the next month or two he would receive a six-figure injury settlement so that Cox could pay Lopez-Ortiz and that Cox would "get back to [Lopez-Ortiz]."  Ex. 8 at 5.

When Cox testified, he confirmed that he had been the first one to bring up murdering Lisa. As he exited the elevator, Cox turned to Lopez-Ortiz and said that he would split an insurance

policy on Lisa's life with Lopez-Ortiz if Lopez-Ortiz made Lisa "disappear." 4 RP at 690. Cox testified that he was only joking and that he wanted to "call [Lopez-Ortiz's] bluff" when Cox suggested a meeting. 4 RP at 691. But Cox also said he was extremely frustrated and "in a very dark place," so he wanted to know if Lopez-Ortiz was serious. 4 RP at 692. Cox also testified that he had told Parmley that Cox felt like he had been "set up" by Lopez-Ortiz and that "it appeared to be entrapment." 4 RP at 711.

### D. SOLICITATION TO MURDER LOPEZ-ORTIZ (COUNT II)

Parmley testified that Cox thought the only way to avoid a conviction for planning to murder Lisa would be for Lopez-Ortiz to "disappear." 3 RP at 481. Cox asked for Parmley's assistance, and Parmley said that he had a friend who would kill Lopez-Ortiz and dispose of his body on a pig farm.

Hoping to make a deal with the State, Parmley told the police about his conversations with Cox. However, the State never promised any favorable treatment, and Parmley received no special consideration for the information he provided. Parmley said that after the other inmates found out he had assisted the police, he was physically confronted and treated "[l]ike slime." 3 RP at 508.

Cox claimed that he had never asked Parmley to make anyone "disappear" and that Parmley had volunteered to help Cox in exchange for Cox paying Parmley's bail. 4 RP at 714. Cox testified that he never offered or agreed to pay any money to Parmley. Another inmate testified that Parmley had said Cox was Parmley's "'golden ticket out of [prison].'" 4 RP at 620.

### E. JURY INSTRUCTIONS AND CLOSING ARGUMENT

The trial court instructed the jury on the elements of a DV-VPO. Part of those instructions required the jury to find beyond a reasonable doubt that "the defendant knowingly violated a

restraint provision of the order prohibiting contact with a protected party or a provision of the order excluding the person from a residence, school, workplace, or daycare." Clerk's Papers (CP) at 88.

During closing argument, the prosecutor stated that a person commits a DV-VPO when he "knowingly violates restraint provisions of the order prohibiting contact with the protected party or provision[s] of the order excluding the person from a residence." 5 RP at 851. The prosecutor explained that "[n]o one is saying [Cox] went into a location he wasn't supposed to. . . . I would submit to you there's actually two parts of this order that were violated and we talked about the contact." 5 RP at 855. The other provision that was violated, the prosecutor argued, was the no-harassment provision.

The prosecutor also discussed Parmley's credibility. The prosecutor emphasized that Parmley had never been promised nor received any favorable treatment for his testimony. "[Parmley's] already been labeled an informant, a snitch, he's already been verbally and physically assaulted on multiple occasions." 5 RP at 910. He "never backed out even after he knew he wasn't getting a deal. . . . [H]e kept going with law enforcement, he kept cooperating and came in and testified even knowing [he would not get a deal]." 5 RP at 911. Cox did not object to these comments.

### III. VERDICT AND SENTENCING

The jury found Cox guilty of all three counts. Before sentencing, Cox submitted a sentencing memorandum that conceded his offender score for the solicitation of Lisa's murder (count I) should include one point for his gross misdemeanor DV-VPO conviction (count III).

The sentencing court calculated an offender score of "1" for the solicitation of Lisa's murder (count I). The court sentenced Cox to imprisonment for 218.63 months on count I, 180

months on the solicitation of Lopez-Ortiz's murder (count II), and 364 days for the gross misdemeanor DV-VPO (count III), with counts I and II running consecutively and count III running concurrently. The solicitation of Lisa's murder (count I) and the DV-VPO (count III) were both domestic violence offenses. Cox appeals his convictions and sentence.

## ANALYSIS

### I. PUBLIC TRIAL RIGHT

Cox argues that our decision on direct appeal vacating his conviction due to a public trial violation should be upheld because *Love* is distinguishable. Cox argues that unlike in *Love*, there is no transcript here of the for-cause sidebar discussion for public review and scrutiny. We hold that the safeguards identified in *Love* are present here.

### A. STANDARD OF REVIEW AND APPLICABLE RULES OF LAW

Whether the trial court has violated a defendant's right to a public trial is a question of law that we review de novo. *State v. Smith*, 181 Wn.2d 508, 513, 334 P.3d 1049 (2014). "A three-step framework guides our analysis in public trial cases." *State v. Love*, 183 Wn.2d 598, 605, 354 P.3d 841 (2015), *cert. denied*, 136 S. Ct. 1524 (2016). First, we ask does the public trial right attach to the proceeding at issue? *Love*, 183 Wn.2d at 605. Second, if the right attaches, we ask was the courtroom closed? *Love*, 183 Wn.2d at 605. Third, if the appellant established there was a closure, we determine whether the closure was justified. *Love*, 183 Wn.2d at 605. The appellant bears the burden of proving whether the public trial right attaches to the proceeding and whether there was a courtroom closure. *Love*, 183 Wn.2d at 605.

First, it is established that for-cause challenges implicate the public trial right. *Love*, 183 Wn.2d at 606. Thus, at issue here is whether Cox demonstrates the for-cause sidebar discussion amounts to a "closure" under *Love*.

In *Love,* voir dire occurred in open court, and at the close of questioning, the attorneys approached the bench and the court reporter transcribed the discussion regarding the for-cause challenges. 183 Wn.2d at 602.

Love argued that the possibility that spectators at his trial could not hear the discussion about for-cause challenges rendered this portion of his trial inaccessible to the public. *Love*, 183 Wn.2d at 606. The *Love* court disagreed and held that there had been no closure. 183 Wn.2d at 606. The court explained,

> [T]he public had ample opportunity to oversee the selection of Love's jury because no portion of the process was concealed from the public; no juror was questioned in chambers. To the contrary, observers could watch the trial judge and counsel ask questions of potential jurors, listen to the answers to those questions, see counsel exercise challenges at the bench and on paper, and ultimately evaluate the empaneled jury. The transcript of the discussion about for cause challenges and the struck juror sheet showing the peremptory challenges are both publically available. The public was present for and could scrutinize the selection of Love's jury from start to finish, affording him the safeguards of the public right missing in cases where we found closures of jury section.

*Love*, 183 Wn.2d at 607.

Here, Cox does not dispute that the for-cause challenges discussion occurred in open court. He argues only that the *transcript* of the trial court's *summary* of the sidebar discussion regarding the for-cause challenges is not equivalent to the transcript of the actual sidebar discussion in *Love*. Cox cites no authority for his argument that a trial court's on-the-record summary of the sidebar discussion does not provide an equivalent safeguard to his public trial right as the transcript of the sidebar discussion did in *Love*.

10

The State argues that the record the trial court made after the jury was seated is not "less of a record" than the transcript set forth in the *Love* opinion. Suppl. Br. of Resp't at 4. The State correctly points out that neither attorney objected to the record the trial court made and that this record was available to the public.

We reject Cox's assertion that a transcript of the trial court's summary of the sidebar conference is not the equivalent of a transcript of the sidebar conference itself. The *Love* court did not hold that a transcript of the actual sidebar discussion was required to avoid a courtroom closure. Following *Love*, we evaluate whether juror questioning took place in open court, whether the public could see the for-cause challenges taking place at the sidebar conference, and whether the court made a publicly available record of the sidebar conference. 183 Wn.2d at 607. Those factors are met here, and thus Cox was afforded the "assurance of the fairness" secured by public scrutiny as required by open court jurisprudence. *Love*, 183 Wn.2d at 607.

## II. JURY UNANIMITY ON THE DV-VPO (COUNT III)

Cox contends that the prosecutor violated his right to a unanimous jury when the prosecutor argued in closing that Cox had violated both the no-contact and no-harassment provisions of the protection order. Cox argues that because there was no way to know which provision the jurors relied on to convict him, his DV-VPO conviction (count III) should be reversed.[5] We disagree.

---

[5] The State argues also that violation of a protection order is not an alternative means crime. However, we need not reach this issue because we conclude that sufficient evidence supports both of the State's theories, thus no express jury unanimity is required. *State v. Owens*, 180 Wn.2d 90, 95, 323 P.3d 1030 (2014).

### A. STANDARD OF REVIEW AND LEGAL PRINCIPLES

Article I, section 21 of the Washington Constitution provides criminal defendants the right to a unanimous jury verdict, including the right to a unanimous jury determination of the means by which the defendant committed the crime. *State v. Owens*, 180 Wn.2d 90, 95, 323 P.3d 1030 (2014). Express jury unanimity as to means is not required, however, when there is sufficient evidence to support both alternative means. *Owens*, 180 Wn.2d at 95. We view the evidence in the light most favorable to the State when we determine whether sufficient evidence exists to support the alternative means. *Owens*, 180 Wn.2d at 99.

### B. SUFFICIENT EVIDENCE SUPPORTS BOTH THEORIES

Viewing the evidence in the light most favorable to the State, Cox tailgated his wife and made an obscene gesture, mouthed words, and honked his horn at her. These actions were a violation of the protection order provision prohibiting "harassing" Lisa. Ex. 3 at 2. These actions were also a violation of the protection order provision prohibiting Cox "from having any contact whatsoever" with Lisa. Ex. 3 at 2.

Cox claims that the jury "could have reasonably believed there was no impermissible contact since Cox had a right to be where he was," so that the evidence of contact is insufficient. Br. of Appellant at 21. But the protection order does not give Cox a right to contact Lisa under any circumstances. The exception allowing Cox to use Capitol Boulevard to commute is an exception from the provision barring Cox from coming within 500 feet of Lisa's residence. It is not an exception from the no-contact provision.

Because the evidence is sufficient to support both theories argued, we affirm Cox's DV-VPO conviction (count III).

III. PROSECUTORIAL MISCONDUCT AS TO SOLICITATION TO MURDER LOPEZ-ORTIZ (COUNT II)

Cox argues that the prosecutor committed misconduct because he "impliedly vouched" for the credibility of Parmley, the State's main witness for the solicitation of Lopez-Ortiz's murder (count II), during closing arguments. Br. of Appellant at 24. Cox claims that the prosecutor "impliedly vouched" for Parmley's credibility when the prosecutor argued that Parmley must have been truthful because he had nothing to gain and because his testimony incurred the odium of other inmates and labeled him a "'snitch.'" Br. of Appellant at 24-25. We conclude that Cox's argument fails because the prosecutor's argument was proper.

A. STANDARD OF REVIEW AND LEGAL PRINCIPLES

To prevail on a claim of prosecutorial misconduct, the defendant must show that the prosecutor's conduct was both improper and prejudicial. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). Further, where the defendant did not object to the claimed misconduct at trial, the defendant waives the error "unless he establishes that the misconduct was so flagrant and ill intentioned that an instruction would not have cured the prejudice." *Glasmann*, 175 Wn.2d at 704.

It is improper for a prosecutor to vouch for the credibility of a witness. *State v. Walker*, 182 Wn.2d 463, 478, 341 P.3d 976, *cert. denied*, 135 S. Ct. 2844 (2015). Vouching occurs when a prosecutor expresses a personal belief in the veracity of a witness or indicates that evidence not presented at trial supports the witness's testimony. *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010). It is not improper, however, for a prosecutor to draw reasonable inferences from the evidence and argue that a witness is truthful based on those inferences. *State v. McKenzie*, 157

Wn.2d 44, 57, 134 P.3d 221 (2006). Prosecutors have "wide latitude" to draw and express reasonable inferences. *State v. Boehning*, 127 Wn. App. 511, 519, 111 P.3d 899 (2005).

### B. PROSECUTOR'S CLOSING ARGUMENT WAS PROPER

To prevail on a claim of prosecutorial misconduct, Cox must first show the prosecutor's conduct was improper. This he cannot do.

The prosecutor argued that Parmley had nothing to gain by his testimony because Parmley had "already been labeled an informant, a snitch, [and] he's already been verbally and physically assaulted on multiple occasions even outside this jail." 5 RP at 910. The prosecutor noted that Parmley "never backed out even after he knew he wasn't getting a deal. . . . [H]e kept going with law enforcement, he kept cooperating and came in and testified even knowing [he would not get a deal]." 5 RP at 911. At no point did the prosecutor express a personal belief in Parmley's truthfulness, nor did he vouch for him. Rather, the prosecutor drew inferences from the evidence the State had presented: that Parmley had initially hoped for a deal, but had not received one, and that Parmley had been treated "[l]ike slime" after the other inmates learned he assisted the police. 3 RP at 508.

Cox relies on the Supreme Court's statement in *Ish* that "a witness's testimony that they were speaking the truth and living up to the terms of their plea agreement may amount to a mild form of vouching." 170 Wn.2d at 197. But the issue in *Ish* was the prosecutor's reference to a term of a plea agreement requiring the witness to testify "truthfully." 170 Wn.2d at 193, 195. The Supreme Court's concern was that the reference implied that the prosecution had some independent means of ensuring that the witness complied with the agreement. *Ish*, 170 Wn.2d at 198. In contrast, here, the prosecutor's reference did not imply that the prosecutor had some

independent means of ensuring Parmley told the truth. If anything, the prosecutor's closing argument drew the jury's attention to the fact that there was *no plea agreement* with Parmley and that Parmley apparently had agreed to testify without receiving any favorable treatment from the State. Thus, *Ish* is distinguishable.

Because Cox fails to establish that the closing argument was improper, his prosecutorial misconduct argument must fail.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL AS TO SOLICITATION TO MURDER LOPEZ-ORTIZ (COUNT II)

Cox argues that if his counsel's failure to object to the prosecutor's comments waived his prosecutorial misconduct claim, then his counsel was ineffective. His argument fails.

### A. STANDARD OF REVIEW AND LEGAL PRINCIPLES

"A claim that counsel was ineffective is a mixed question of law and fact that we review de novo." *State v. Jones*, 183 Wn.2d 327, 338, 352 P.3d 776 (2015). To prevail, the defendant must show that defense counsel's representation was deficient in that it fell below an objective standard of reasonableness and that the defendant suffered prejudice as a result. *Jones*, 183 Wn.2d at 339 (quoting *State v. Benn*, 120 Wn.2d 631, 663, 845 P.2d 289 (1993)). We need not address both prongs of the test if the defendant's showing on one prong is insufficient. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

### B. NO DEFICIENT PERFORMANCE

As discussed, the prosecutor's argument was not improper "vouching," but proper argument based on the evidence presented at trial and inferences drawn from that evidence. Thus, it was not deficient performance for defense counsel to not object. We hold that Cox fails to

15

establish that his trial counsel was ineffective when counsel did not object to the prosecutor's proper closing argument.

V. SENTENCING CALCULATION FOR SOLICITATION TO MURDER LISA (COUNT I)

Cox argues that the sentencing court miscalculated his offender score for solicitation to murder Lisa (count I) when it included his gross misdemeanor DV-VPO conviction (count III) in his offender score and gave Cox a score of "1." Again, we disagree.

A. STANDARD OF REVIEW AND LEGAL PRINCIPLES

We review the calculation of an offender score de novo. *State v. Moeurn*, 170 Wn.2d 169, 172, 240 P.3d 1158 (2010). A defendant's failure to object to an alleged legal error does not waive his challenge to a miscalculated offender score. *In re Pers. Restraint of Goodwin*, 146 Wn.2d 861, 874, 50 P.3d 618 (2002).

The Sentencing Reform Act of 1981 (SRA), ch. 9.94A RCW, determines the sentencing range for most criminal offenses and takes into account the presence and nature of prior convictions.[6] *See* RCW 9.94A.525. A sentencing court calculates the "offender score" for a conviction for a felony domestic violence offense by including one point for "a repetitive domestic violence offense as defined in RCW 9.94A.030, where domestic violence as defined in RCW 9.94A.030, was plead [pleaded] and proven." RCW 9.94A.525(21)(c) (alteration in original). A "'repetitive domestic violence offense'" includes any "[d]omestic violence violation of a

---

[6] Cox argues that the SRA's scoring provisions do not apply to his DV-VPO conviction (count III) because it is a gross misdemeanor, not a felony. Although the SRA generally does not use misdemeanors (or gross misdemeanors) to calculate an offender score, it does have rules that allow misdemeanors to be counted towards a felony offender's offender score when that offender is being sentenced for a particular type of crime. *See* RCW 9.94A.525(21)(c); former RCW 9.94A.030(41)(a)(iii) (2012).

protection order under chapter . . . 26.50 RCW that is not a felony offense." Former RCW 9.94A.030(41)(a)(iii).

### B. DOMESTIC VIOLENCE OFFENSE

Cox argues that the sentencing court improperly included the gross misdemeanor DV-VPO (count III) in his offender score for his conviction of solicitation of Lisa's murder (count I). We disagree.

The jury convicted Cox of count III, the DV-VPO, which was charged under chapter 26.50 RCW and was a gross misdemeanor. The DV-VPO conviction was a "'repetitive domestic violence offense'" under the definition of former RCW 9.94A.030(41). The DV-VPO conviction was counted as one point toward Cox's offender score for the solicitation of Lisa's murder (count I), which was a felony domestic violence offense. As explained more fully below, we conclude that the sentencing court properly included the DV-VPO conviction in its offender score calculation for the solicitation of Lisa's murder.

### C. "PRIOR" AND "OTHER CURRENT" CONVICTION

Cox argues that his DV-VPO conviction (count III) was entered on the same day as his conviction for solicitation of Lisa's murder (count I), so that the DV-VPO conviction is not a "prior" conviction. We disagree.

The offender score statute defines a "prior conviction" as one that exists before the date of sentencing; convictions sentenced on the same date are "'other current offenses'" under former RCW 9.94A.589 (2002). RCW 9.94A.525(1). But when a person is convicted of multiple serious violent offenses (such as criminal solicitation to murder), the range for the more serious offense is

determined using both prior convictions *and* "other current convictions that are not serious violent offenses" in the offender score. Former RCW 9.94A.589(1)(b).

Here, the DV-VPO conviction (count III), a gross misdemeanor, is an "other current offense" under former RCW 9.94A.589. Because Cox was convicted of two serious violent offenses (the solicitation convictions for counts I and II), the DV-VPO conviction (count III) was properly used to calculate his offender score. Thus, Cox is incorrect that the DV-VPO conviction cannot be included in his offender score because it is not a "prior" offense. The DV-VPO conviction was properly considered as an "other current offense." Therefore, we conclude that the sentencing court properly included the DV-VPO conviction (count III) in its offender score calculation for count I.

### D. "REPETITIVE" OFFENSE

Cox argues that the DV-VPO conviction (count III) is not "repetitive," so it cannot be a "'repetitive domestic violence offense.'" Br. of Appellant at 30-31. Again, we disagree.

In *State v. Rodriguez*, the defendant argued that her nonfelonious domestic violence conviction for violation of a no-contact order (VNCO) should not have been included in calculating her sentence for a felony arising from the same incident. 183 Wn. App. 947, 955, 335 P.3d 448 (2014), *review denied*, 182 Wn.2d 1022 (2015). The defendant acknowledged that the sentencing provision required counting one point for a "repetitive domestic violence offense" as defined in former RCW 9.94A.030. *Rodriguez*, 183 Wn. App. at 953-54. But she argued that the VNCO was not "repetitive" because it was committed at the same time as the felony offense, was against a different victim, and was not part of a repetitive pattern. *Rodriguez*, 183 Wn. App. at 954. We noted that former RCW 9.94A.030(41) defines a "'repetitive domestic violence offense'"

as *a* domestic violence VPO or VNCO. *Rodriguez*, 183 Wn. App. at 958 (quoting RCW 9.94A.525(21)(c)). Thus, we rejected the defendant's argument as contrary to the plain language of the sentencing provision. *Rodriguez*, 183 Wn. App. at 958.

Although in *Rodriguez* the defendant claimed her violation of a *no-contact* order was not "repetitive," both VNCOs and VPOs are included within former RCW 9.94A.030(41)'s definition of "'repetitive domestic violence offense.'" Thus, *Rodriguez* controls here, and we reject Cox's argument regarding the plain language meaning of *repetitive*. The sentencing court properly included Cox's DV-VPO conviction (count III) in its calculation of Cox's offender score. Accordingly, we affirm Cox's sentence for solicitation to commit Lisa's murder (count I) based upon his offender score of "1."

VI. INEFFECTIVE ASSISTANCE OF COUNSEL AS TO SOLICITATION TO MURDER LISA (COUNT I)

Cox argues that if we find he waived his offender score argument when he did not object to an offender score of "1" at sentencing, we should find that Cox has established the elements of ineffective assistance of counsel. But we do not conclude that Cox waived his legal challenge to his offender score.

A defendant does not waive an offender score challenge when he agrees to the offender score at sentencing if the alleged error is legal. *Goodwin*, 146 Wn.2d at 874. Cox's challenge is based on legal error; thus Cox may challenge an error in the calculation of his offender score for the first time on appeal even though he agreed to his offender score at sentencing. Accordingly, we do not address his ineffective assistance of counsel claim.

VII. SAG CLAIMS

In his SAG, Cox raises multiple additional challenges to his conviction. Because we previously addressed Cox's sufficiency of the evidence contentions regarding each count, we need not address those arguments on remand.[7] Cox's remaining SAG issues all either lack merit or cannot be reviewed for the reasons that follow.

A. MATTERS OUTSIDE THE RECORD

Several issues that Cox raises involve documents and facts not contained in the record before us. Accordingly, we do not review those issues.

Although "[r]eference to the record and citation to authorities" is not necessary, a SAG should refer only to those documents contained in the record on review. RAP 10.10(c). Issues involving facts outside the record are appropriate for a personal restraint petition, not a SAG. *State v. McCreven*, 170 Wn. App. 444, 481, 284 P.3d 793 (2012) (citing *State v. McFarland*, 127 Wn.2d 322, 338, 899 P.2d 1251 (1995)).

1. RECORDING AUTHORIZATION ISSUES

Cox asserts that there was no legitimate reason for the State to seek a recording authorization.[8] Cox also contends that the request for a second recording authorization (to record his meeting with Lopez-Ortiz) incorrectly stated that it was the "first" such request. Thus, Cox reasons, the video recording of Cox and Lopez-Ortiz's meeting should not have been allowed as

---

[7] In our prior opinion, we held that sufficient evidence supported all three of Cox's convictions. *Cox*, noted at 187 Wn. App. 1038.

[8] It is unclear whether Cox argues that there was no legitimate reason to obtain the first, the second, or both of the recording authorizations that the police obtained.

evidence. In addition, Cox claims that it was ineffective assistance of counsel for his defense counsel not to move to suppress either authorization.

A diligent search of the record reveals no copy of either authorization or details about the authorizations other than references to their existence. Because Cox's recording authorization-based claims rest on matters outside the record, these issues are not appropriately before us.

2.      VIDEO PRESERVATION ISSUE

Cox contends that the police "purposeful[ly]" failed to preserve the recording of his entire interrogation. SAG at 2. In support, Cox alleges several facts outside the record: violation of his *Miranda*[9] rights, denial of counsel, coercion, lack of a witness, and denial of food and water for the four hours of interrogation.

The failure to preserve evidence that is "'potentially useful'" to a defendant does not violate due process unless the defendant shows that the police acted in bad faith. *State v. Groth*, 163 Wn. App. 548, 557, 261 P.3d 183 (2011).

The police did not record about 40 minutes of Cox's interrogation due to an equipment malfunction. Cox alleges bad faith because the destruction allowed the police to conceal alleged *Miranda* violations and other improper interrogation techniques. However, Cox fails to cite to any evidence in the record that supports his allegations of police misconduct. As Cox rests his contentions on facts outside the record on appeal, these issues are not appropriately before us.

---

[9] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

3.      EXCESSIVE BAIL

Cox contends that his bail was set at $800,000, an excessive amount that denied him of constitutional rights and the enjoyment of a full and fair defense. The record before us does not contain the transcript of Cox's bail hearing or other explanation of how the trial court determined the amount of bail. These issues are outside the record and are therefore not properly before us.

4.      JURY ISSUES

Cox claims that there are two jury issues: jury pool tainting and juror misconduct. Cox claims a prospective juror tainted the jury pool when he declared that solicitation "'is a cowardise [sic] crime.'" SAG at 3. Cox alleges that another juror committed misconduct when he stated he was a "'professional' person reader," skilled in perceiving the accuracy of statements. SAG at 3. However, the transcript of jury selection is not part of our record. Thus, because these issues rely on facts outside our record, these issues are not properly before us.

## B. REMAINING SAG ISSUES

1.      INACCURATE TRANSCRIPT

Cox contends that there were multiple errors in the transcript of his meeting with Lopez-Ortiz, including that the State "purpose[ly]" transcribed "'you're [Lopez-Ortiz] talking murder'" as "'we're talking murder.'" SAG at 4. However, the jury did not receive the transcript into evidence; they listened to the actual recording of the meeting. Thus, it is immaterial whether the transcript was erroneous.[10] Cox's assertion that the transcript was inaccurate is without merit.

---

[10] Further, our review of the exhibit reveals that Cox says, "We're talking murder," in the recording. Ex. 6 at 11 min., 30 sec. (on file with the court).

2.    PROSECUTORIAL MISCONDUCT

Cox claims that the prosecutor made two additional improper statements during his closing argument.  First, the prosecutor stated that the phone conversation between Cox and Lopez-Ortiz "'refer[red] to having Lisa . . . killed,'" although Cox claims that he had only ever said he wanted Lisa to "'disappear'" and that at no point did he or Lopez-Ortiz mention murder during the phone call.  SAG at 5.  Second, the prosecutor stated that "[j]ust the mere fact that an offer was made under these conditions is sufficient [for a solicitation conviction]."  5 RP at 859.  Cox contends that "[n]o offer was made at any time."  SAG at 5.

It is not prosecutorial misconduct for a prosecutor to draw reasonable inferences from the evidence and to express those inferences to the jury.  *McKenzie*, 157 Wn.2d at 57.  Prosecutors have "wide latitude" in doing so.  *Boehning*, 127 Wn. App. at 519.

During the recorded phone conversation with Cox, Lopez-Ortiz said he wanted to talk about the "stuff" they had discussed "outside the elevator."  Ex. 7 at 2.  In the conversation outside the elevator, Cox had proposed to give Lopez-Ortiz half of the life insurance policy on Lisa's life if Lopez-Ortiz made Lisa "permanently disappear."  2 RP at 290.  It was thus reasonable to infer that during the telephone call, Cox and Lopez-Ortiz were discussing having Lopez-Ortiz kill Lisa.  Similarly, the State's evidence included both video and testimonial evidence that Cox offered to give Lopez-Ortiz money to kill his wife.  Both the prosecutor's arguments were proper because they were based on reasonable inferences from the evidence before the jury.  Cox's assertions of prosecutorial misconduct are without merit.

3.     ENTRAPMENT/ENTICEMENT

a.     ENTRAPMENT INSTRUCTION

Cox appears to claim that the trial court should have instructed the jury on an entrapment defense. Cox asserts that Lopez-Ortiz called Cox to "lure" him to commit a crime, "steering [Cox] down a path that would not [otherwise] have been taken." SAG at 5.

Cox did not request an entrapment instruction at trial, and the failure to request an entrapment instruction waives the issue on appeal. *State v. Huynh*, 175 Wn. App. 896, 911, 307 P.3d 788 (2013) (citing *State v. Scott*, 110 Wn.2d 682, 686, 757 P.2d 492 (1988)). But we review whether an entrapment instruction was appropriate because Cox also claims ineffective assistance of counsel.

For the defense to obtain a jury instruction regarding the defense's theory of the case, there must be sufficient evidence supporting the instruction. *State v. Redmond*, 150 Wn.2d 489, 493, 78 P.3d 1001 (2003).

To prove entrapment, a defendant must show by a preponderance of the evidence that he committed a crime, the State or a state actor lured or induced him to commit the crime, and the defendant lacked the disposition to commit the crime. *State v. Lively*, 130 Wn.2d 1, 9, 921 P.2d 1035 (1996); *see* RCW 9A.16.070(2). But entrapment is not a defense if law enforcement "merely afforded the actor an opportunity to commit a crime." RCW 9A.16.070. The use of a normal amount of persuasion to overcome the defendant's resistance is not entrapment; neither is the mere reluctance of the defendant to violate the law. *State v. Trujillo*, 75 Wn. App. 913, 918, 883 P.2d 329 (1994).

Cox testified at trial that he, and not Lopez-Ortiz, first proposed that Lopez-Ortiz kill Lisa in return for payment when Cox spoke with Lopez-Ortiz outside the elevator at work. Cox testified that he was only joking. Cox also testified that he had told Parmley that Cox felt like he had been "set up" and that Lopez-Ortiz entrapped him. 4 RP at 711. But Cox did not otherwise testify at trial that he believed he had been set up or entrapped. Lopez-Ortiz did not "steer" Cox during the phone conversation; rather, Lopez-Ortiz asked if Cox was still "serious" about the "stuff" they had discussed outside the elevator. Ex. 7 at 2.

Thus, the evidence before the trial court was insufficient to support giving an entrapment defense instruction. Accordingly, even if Cox had requested such an instruction, the trial court would not have erred if it declined to give the instruction.

b.    INEFFECTIVE ASSISTANCE OF COUNSEL REGARDING THE ENTRAPMENT INSTRUCTION

Cox contends that it was ineffective assistance for his defense counsel not to file a "motion for entrapment." SAG at 8. This contention fails.

To prevail on a claim of ineffective assistance of counsel, the defendant must show both deficient performance and that the performance prejudiced his defense. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). If one of the two elements is not satisfied, the inquiry ends. *Kyllo*, 166 Wn.2d at 862. Counsel's failure to request an instruction to which a defendant is not entitled is not ineffective assistance of counsel. *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 718, 327 P.3d 660 (2014).

Because Lopez-Ortiz was not entitled to an entrapment instruction, as discussed above, his counsel did not perform deficiently when he did not request such an instruction. Accordingly, both Lopez-Ortiz's ineffective assistance of counsel claim and his related entrapment claim are meritless.

4. IMPERMISSIBLE OPINION ON GUILT/VERACITY

Cox contends that Lopez-Ortiz's statement that Cox was "'serious'" at the end of the telephone call[11] recording was an impermissible opinion on Cox's guilt and his veracity. SAG at 6. He claims that his defense counsel's failure to object to that part of the recording was ineffective assistance of counsel.

a. MANIFEST ERROR AFFECTING A CONSTITUTIONAL RIGHT

A witness may not provide an opinion on the defendant's guilt or the veracity of other witnesses. *State v. Montgomery*, 163 Wn.2d 577, 591, 183 P.3d 267 (2008). Where a defendant did not object to such an opinion, we will review the alleged error only if it is manifest error affecting a constitutional right. *Montgomery*, 163 Wn.2d at 595; RAP 2.5(a)(3). Error is manifest only if it caused actual prejudice or practical and identifiable consequences. *Montgomery*, 163 Wn.2d at 595-96 (holding that where the jury was instructed that it was the sole judge of witness credibility, allegedly improper opinion testimony could not have resulted in actual prejudice).

---

[11] Cox claims that at the end of the recording of the in-person meeting between him and Lopez-Ortiz, Lopez-Ortiz said, "[Cox's] serious." SAG at 6. But Lopez-Ortiz made no such comment. Cox apparently means the end of the phone call recording, when Lopez-Ortiz says, "Oh boy, [Cox is] not joking." Ex. 7 at 4.

The State played the recording of the phone call between Lopez-Ortiz and Cox, in which they discuss killing Lisa, for the jury. At the end of the recording, Lopez-Ortiz hung up the phone and commented to the police, "Oh boy, he's not joking." Ex. 7 at 4.

We hold that even if Lopez-Ortiz's comment was an improper opinion, Cox has not shown any actual prejudice or practical and identifiable consequences resulting from the comment. The jury heard the recording of the entire conversation themselves. As in *Montgomery*, the jury was instructed that it was the sole judge of the credibility of the witnesses. That instruction cured any prejudice resulting from Lopez-Ortiz's brief comment. Cox's argument that this particular comment at the end of the recording resulted in actual prejudice or any practical and identifiable consequences fails. For this reason, Cox fails to establish any error in allowing Lopez-Ortiz's comment was "manifest" error. Accordingly, we will not consider this argument, which Cox raises for the first time on appeal.

   b.    INEFFECTIVE COUNSEL

As discussed, it is not apparent from the record that Cox suffered any prejudice from the comment to which he objects, in light of the jury hearing the entire recorded conversation and the court's instruction to the jury about witness credibility. Cox cannot establish a reasonable probability that the outcome of the proceeding would have differed even if he had objected to the allegedly improper statement. Accordingly, Cox's claim of ineffective assistance of counsel is without merit.

5.      FAILURE TO ADMINISTER *ANDERSON* TEST

Cox asserts that the trial court erred when it did not subject Parmley's testimony to the test from *State v. Anderson*, 107 Wn.2d 745, 733 P.2d 517 (1987).  Cox further claims that his defense counsel provided ineffective assistance when he failed to request use of the *Anderson* test.

The *Anderson* test, which ensures the circumstances surrounding a statement render the statement inherently trustworthy, applies only to testimony raising "confrontation clause concerns."  *State v. Roberts*, 142 Wn.2d 471, 497, 14 P.3d 713 (2000).  To prevail on a claim of ineffective assistance of counsel, the defendant must show both deficient performance and that the performance prejudiced his defense.  *Sutherby*, 165 Wn.2d at 883.

Because Parmley testified at trial, there were no confrontation clause concerns.  Thus, counsel's request for an *Anderson* test would have been futile.  Therefore, the trial court did not err, and it was not deficient performance for Cox's counsel not to request that the trial court administer the *Anderson* test.

6.      MALICIOUS PROSECUTION

Cox asserts that the State added the charges for solicitation of Lopez-Ortiz's murder (count II) and DV-VPO (count III) only to "give the appearance of credibility to his weak case."  SAG at 8.  It is malicious prosecution for one to "maliciously and without probable cause therefor, cause . . . another to be arrested or proceeded against for any crime of which he . . . is innocent."  RCW 9.62.010.  However, a conviction conclusively proves that there was probable cause, unless that

conviction was obtained by fraud, perjury, or other corrupt means. *Hanson v. City of Snohomish*, 121 Wn.2d 552, 560, 852 P.2d 295 (1993). Cox's malicious prosecution contentions as to solicitation of Lopez-Ortiz's murder (count II) and DV-VPO (count III) are meritless because those contentions are foreclosed by his convictions.

7.    EXCESSIVE SENTENCE

Cox claims that his "sentence[s]" were "draconian" and clearly excessive in light of the "weakness of the charges," the lack of "aggravating factors," and the failure to take into account "similar case penalt[ies]." SAG at 8. But "[a] sentence within the standard sentence range . . . shall not be appealed."[12] RCW 9.94A.585(1); *State v. Williams*, 149 Wn.2d 143, 146, 65 P.3d 1214 (2003). Cox's sentences were each within the standard range sentence for his convictions. His excessive sentence claim therefore is without merit.

## VIII.  APPELLATE COSTS

Although the substantially prevailing party typically receives an award of appellate costs, the appellate court may "direct[ ] otherwise in its decision terminating review." RAP 14.2.

The trial court entered an order of indigency because it found Cox was "unable by reason of insufficient funds to pay for all or some of the expenses of appellate review." Order of Indigency, *State v. Cox*, No. 13-1-00914-9 (Thurston County Super. Ct., Mar. 5, 2014). In

---

[12] Cox's challenge to the calculation of his offender score for the solicitation of Lisa's murder (count I) falls within the exception to this rule for "a party's right to challenge the underlying legal conclusions and determinations by which a court comes to apply a particular sentencing provision." *State v. Williams*, 149 Wn.2d 143, 147, 65 P.3d 1214 (2003).

addition, Cox was 44 years old at sentencing, and he was sentenced to 399 months in prison. In the interest of preserving judicial resources, we direct that the State is not awarded appellate costs.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, J.

We concur:

WORSWICK, P.J.

MELNICK, J.